UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION
NO. 5:07-HC-2177-BR

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES BARTON HORN | RESPONDANT'S PROPOSED<br>FINDING'S OF FACT AND<br>CONCLUSIONS OF LAW<br>(Local Rule 52.1) |

Comes now the respondent, James Horn, by and through undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## 1.    INTRODUCTION

Petitioner, the United States of America ("the Government"), instituted this civil action on September 27, 2007, seeking to commit James Horn ("Mr. Horn" or "Respondent") as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act"). 18 U.S.C. § 4248.  The Government filed a certificate stating that mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Act. A certificate filed under the Act stays Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a

1

sexually dangerous person.

The Court held a two-day evidentiary hearing in this matter on October 24 and 25, 2011. The ultimate issues at hearing were:

A. Has Mr. Horn engaged or attempted to engage in sexually violent conduct or child molestation that has cause him to be sexually dangerous to others?

B. Does Mr. Horn suffer from a serious mental illness, abnormality, or disorder?

C. As a result of his serious mental illness, abnormality, or disorder, would Mr. Horn have serious difficulty in refrainjng from sexually violent conduct or child molestation if released?

The Petitioner presented evidence in the form of various exhibits and the testimonies of Drs. Dale R. Arnold and Lena Demby. The respondent testified and also presented evidence in the form of various exhibits and the testimony of the Court appointed examiner, Dr. Joseph J. Plaud as well as the deposition testimonies of Kimberly D. Keeton , and Mr. Horn's sister, Pamela

Harris.

The Court had reviewed the curricula vitae of Drs. Demby, Arnold, and Plaud and had found that each was entitled to offer expert testimony in this matter regarding the diagnosis of Mr. Horn mental health and the issue of whether he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that the Government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act and the Constitution.

2

**II. FINDINGS OF FACT**

1.   James Horn was born in 1967  and at the time of the evidentiary hearing was 44 years of age.  He has been held in federal custody continuously sine July, 1996.

2.   Mr. Horn's release date from the Bureau of Prisons ("BOP") was October 22, 2007. At the time of this hearing, Mr. Horn had been incarcerated four years beyond his release date.

**A. Personal History**

3.   Mr. Horn was raised on a farm in Sedalia, Missouri. He has a sister and two brothers. His parents divorced when he was an infant. At the age of 2 years, his mother remarried . His biological father was  reportedly an alcoholic. Although one mental health record from 1991 indicates he may have been abused verbally, sexually and physically by his mother as a child, other records contradict those facts and it appears that his mother was strict but not abusive. After her children grew up and left the farm, Mr. Horn's mother became a school teacher. She died in July, 2008.  Mr. Horn maintains contact with both his biological and step-fathers, as well as his siblings. His family remains in Missouri.  Mr. Horn's natural father ceased drinking alcohol over fifteen years ago and Respondent has reestablished a relationship to him to such an extend that they maintain daily telephone and/or written contact.

3.   Mr. Horn's educational history revealed that he had no problems in school, with the exception of a few minor disciplinary problems, and graduated from Cole Camp High School in Cole Camp, Missouri, in May, 1985. While in school, he worked on the family farm.  His post high school education consists of completing two semesters at Central Texas College while he was stationed at Okinawa, Japan. While incarcerated within the federal system from 1996

3

through the present, he has completed courses in English Grammar I, Social Services, Fair-Parent, ACE Algebra, Astronomy, Semi-Annual Social Service Fair, completed Conversational Spanish, Adult/Childhood Development and Career Counseling.

4. There is no evidence that Mr. Horn experienced unusual behavioral or social difficulties at home or at school during his childhood and teen years, nor are there any indications that he was involved in the juvenile or criminal court system.

5. Mr. Horn's military history revealed that he joined the United States Marine Corps after his high school graduation, on August 8, 1985. He worked as a mechanic, spending two years in Okinawa, Japan, and two years in North Carolina. He was Honorably discharged on August 7, 1989, with the rank of Corporal.

6. Mr. Horn's civilian work history revealed that he worked as a long-distance truck driver off and on and as a grinder at a steel mill.

7. Although Mr. Horn testified he had occasionally consumed alcohol and, on a few occasions, marijuana, and cocaine, there does not appear to be an interest in those drugs, nor a history of substance abuse.

**B. Male Female Relationships**

8. Mr. Horn's interest in sex began at the age of 13 years, He had a long term girlfriend in high school. That relationship ended when her family moved away. His initial experience with intercourse occurred at the age of 19 years when he had sexual relations with a female marine in Okinawa, Japan. They had an "exclusive relationship for a few weeks" until the relationship mutually ended.

4

9.  He married for the first time in December, 1989, following his discharge from the United States Marine Corps. They had dated and then lived together for five months before they married. They separated a year later.  This relationship ended in sexual violence when she advised him that she was separating. They were divorced in 1991.

10.  Mr. Horn dated a co-worker in 1992, but she broke up with him after five weeks. Later, he was convicted of kidnapping and raping her after she broke up with him.

11.  In June, 1995, he married his second wife. However, the relationship also ended in sexual violence as she was initiating divorce proceedings.  They had a son, born after he was arrested prior to the child's birth.

12.  Mr. Horn was also involved in a 6-month live-in sexual relationship while in the Marine Corps in North Carolina, with no indication of sexual violence and a three month relationship with a woman in Missouri after the end of his first marriage, again with no indication of sexual violence.

13.  There is no evidence in the records that, apart from the sexual abuse against his adult female partners at the end of the relationships, his sexual behavior while married or in other intimate relationships was characterized by the suffering or humiliation of himself or his sexual partners. Records indicate that both his ex-wives (in a victim impact statement and a statement to the FBI) indicated that Mr. Horn had for a period of time during their marriages been mentally and physically abusive, but not sexually abusive.

**C. Criminal History**

14. Mr. Horn does not have any documented criminal offenses as a juvenile or an adult, other than his sexual offense history.


**D. Sexual Offense History**

5

15. Mr. Horn's first marriage lasted thirteen months and was marked by his abuse of his wife. In January, 1991, she left and moved into her own apartment. He reportedly stalked her and broke into her apartment to steal things. She was packing to move from her apartment after three weeks of separation when he came to the apartment, grabbed her and put a knife to her throat. Over a period of approximately 24 hours, he tied her up and raped her three times. He then took her to a restaurant and she was able to get away from him. She never filed a Police Report and moved to her parents' hometown immediately. He then checked himself into a Texas psychiatric hospital, Orchard Creek Psychiatric. His wife had convinced him that the marriage would be okay if he would receive treatment. During the clinical interview Mr. Horn admitted to committing this sexual abuse against his wife, even though he was not adjudicated for it. He stated his sole reason was borne out of not wanting the relationship to end. He stated that tying her up had nothing to do with sex, but with keeping her captive, and untied her before sexually assaulting her. He stated that he only tied her up when he went to sleep so that she would not escape.

16. On February 8, 1992, Mr. Horn was charged with Rape and Kidnapping. His 22 year-old girlfriend broke up with him via telephone when he was on the road with his I5 – wheeler truck. They had dated and the live in part of their relationship was five weeks old. When he was told she was leaving, he never picked up his load, drove back to her apartment, and broke in using a key. When she awoke, he was rummaging through her closet. He duct taped her mouth and arms and forced her to have sex. He then forced her to sit at the end of the bathtub while he bathed. He then forced her into his truck and drove from Tennessee to Arkansas. He parked at a rest stop, tied her up and forced her to have sex with him. He later drove her back home and released her, at which point she called the Sheriffs Department. He again returned to her apartment, wanting her to voluntarily let him in. He was

6

arrested the following day.

Mr. Horn was charged with Sexual Battery and received a sentence of 4 years of incarceration in September, 1993. He was released in March, 1995

17. In July, 1996, Mr. Horn was charged with Interstate Kidnapping of his pregnant wife. She had moved out in May, 1996, and moved to her mother's house and filed for divorce. In July, 1996, she moved into a new home with her 9-year-old daughter from a previous relationship. On July 20, 1996, he went to her home and broke in while she and her daughter were asleep. He grabbed his wife as she got up to go the bathroom. He held scissors to her throat and forced her to lay on the bed. He made her daughter to go into the bathroom. He then had sex with his wife. He hit her and told her he would kill her if she did not do what he told her. He took her outside, tied up and with a knife to her. He drove her to his truck to get some things. He then drove her to a motel in West Memphis, Tennessee. He tied her to the bed and he went to sleep. They later left the motel, forcing her into the trunk of the car, and drove to Springfield, to another motel. During the time of her kidnapping, he forced her to have sex several times. He contacted a friend while on the run, asking the friend to cash a check for him. Her daughter had contacted the Police to tell about what happened. The FBI contacted his place of work, which was able to put them in touch with his friend who told them that Mr. Horn had contacted him and where he was. Later that day, the FBI was able to raid the motel in Springfield, and arrest him. During the clinical interview Mr. Horn admitted to committing this sexual offense, and further stated that his motivations in all three sexual offenses were the same; namely, his inability to deal with impending separation/divorce. He was trying to keep the relationship as it was before the separation.

In January, 1997, he was convicted of Interstate Kidnapping and received a sentence of 155 months of incarceration in April, 1997.

7

**E.  Bureau of Prison Disciplinary and Employment History**

18.  During his incarceration within the BOP from 1997 through October 2007, Mr. Horn received only one disciplinary infraction-- In August, 1997 he was sanctioned for Indecent Exposure and Being Unsanitary or Untidy.  It appears that, while confined at FCI Atlanta , Mr. Horn was on the exercise field with about five other inmates and one  of the other inmates urinated on the field. All were sanctioned for the offense, but, after review, Mr. Horn's and several of the other inmates' infractions were reduced to Being Unsanitary or Untidy.  There is no evidence that this occurrence was deemed sexual in nature by any of the inmates and it was not deemed sexual in nature according to a 2006 review of Mr. Horn's records.

(Exhibit 23,BOP 243)

19.  While in custody awaiting this hearing, in December, 2010, Mr. Horn refused to refused an order to transfer to another cell because his new cell mate was know for being involved in sodomy.  Mr. Horn was disciplined for this incident.  BOP records do not reveal a reason that he was requested to transfer to this other cell.

20.  During Mr. Horn's federal incarceration for his criminal offense as well as his four year confinement awaiting this hearing, Mr. Horn has asked for and received employment and has consistently achieved an excellent employment record.  When he entered the BOP he entered into a payment contract to satisfy the Court's judgment and by 2001 had fully paid the Court ordered fine of $5000 as well as the $100 assessment.

21.  Mr. Horn has interacted appropriately with staff and other inmates.

8

**F. Mental Health Evaluations** – **1991 Orchard Creek Hospital (Texas), 1996 U.S. Medical Center for Federal Prisoners in Springfield , Missouri,  Various BOP evaluations and reports 1997-2006, Demby 2007 and 2010, Arnold 2010 (supp. April, 2011) and Plaud 2011.**

22.  Mr. Horn voluntarily admitted himself Orchard Creek Hospital in January,1991 after his sexually violent abuse of his first wife.  Mr. Horn was the sole source of all diagnostic information received by the medical staff.  He was admitted on January 30th and discharged, against medical advice, on February 28th.  Mr. Horn's diagnosis on discharge was Major Depressive Disorder (Axis I), Explosive Personality Disorder (Axis II) and Narcissistic Personality Disorder (Axis II). (Exhibit 5,BOP 542)

23.  Upon his arrest in 1996 for interstate kidnapping, 18 U.S.C. §§1201,3571, and 3583, Mr. Horn was referred to the U.S Medical Center for Federal Prisoners by the United States District Court for the Northern District of Missouri.

  The Forensic Report and its supplement (Exhibit 23, BOP261-70) indicates that

"an evaluation was conducted in the Mental Health Evaluation Unit from October 10 to November 22, 1996. Mr. Horn was routinely observed on his ward of residence by both clinical and correctional staff. He was clinically interviewed. A routine admission medical history and physical was completed. The following psychological tests were administered: Shipley Institute of Living Scale, Test of Nonverbal Intelligence-2, Rey Fifteen Item Memory Test, Rey Auditory Verbal Learning Test, Word Recognition Test, Dot Counting Test, Forced Choice "rest of Nonverbal Ability, Forced Choice Test of Verbal Ability, and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

" 2). The following documents were reviewed:

1.The Court Order requesting this evaluation.

2. FBI Investigative Reports concerning the alleged offense, including the report of an interview with Mr. Horn on the day of his arrest.

3. An investigative report and judgment from the state of Tennessee concerning a previous conviction for aggravated kidnapping and rape.

4.. Hospital records, including a psychiatric assessment, psychological assessment, psychosocial assessment, and discharge summary from the Orchard Creek Hospital for an admission from January 30 to February 28, 1991.

Additional information was obtained from telephonic interviews with: Ellen Elsea, Mr. Horn's mother; Jackie Granger, Mr. Horn's former dispatcher at Cardinal Freight; the Personnel Department of Cardinal Freight company; and Special Agent Michael Henry of the **FBI**."(**BOP 250-51**).

Dr. Mrad also obtained the statements of the 1996 victim, as well as those of the1991 victim of the conduct that was not adjudicated.  (Exhibit 24,BOP 268).

Dr Mrad's clinical formulation is as follows:

"Mr. Horn is a 29-year-old male who is functioning at an above average level of intellectual ability. At the present time, he is not psychotic. He does not display evidence of a major mood disorder. He has no history of substance abuse disorders. He does, however, have a repeated history of significant maladjustment in relationships. As a child and a young adolescent, he was somewhat asocial and had limited involvement in relationships both within and outside his immediate family. He apparently had no

10

significant love relationships until early adulthood. Since that time, he has been repeatedly involved in intense relationships in which he has apparently been violent and abusive with his partner. When his partners have ended the relationships, he has not accepted the dissolutions. He has become extremely distressed and, at those times, displayed symptoms of an adjustment disorder to the stress of the breakup. There was no evidence, however, that he has become psychotic at those times. He has apparently become violent in the past and possibly at the present time, if the allegations of his ex-wife are true."

"His history of behavior suggests an underlying personality disorder rather than a major mental illness. A personality disorder has a long-standing, maladaptive pattern of behavior that often results in social or occupational adjustment problems or sometimes subjective distress. In Mr. Horn's case, elements of his personality disorder include: a preoccupation with fantasies of ideal love, a belief that he is unique or special and can only be understood by other special people, a sense of entitlement, absence of empathy for others, a somewhat arrogant attitude, frantic efforts to avoid abandonment, a pattern of unstable and intense interpersonal relationships, inappropriate intense anger, a reluctance to confide in others, and a tendency to read hidden or

11

demeaning meanings in to benign remarks of others. This pattern of

characteristics suggests a narcissistic personality disorder which

also has borderline and paranoid traits."

"From the time Mr. Horn was served with divorce papers to the time

of his current arrest, he apparently demonstrated some symptoms

suggestive of a good deal of emotional distress. He reported

difficulty sleeping and a loss of weight. He was also very

preoccupied with the break up of his relationship. While such

reactions are not uncommon following a marital separation/ it

appears that they may have been more intense in Mr. Horn's case

and may have, at that time, represented an adjustment disorder with

depressed mood. At the time of his 1991 hospitalization, he

apparently displayed similar behavior and symptoms. He was given

a discharge diagnosis of Major Depressive Disorder / but that

diagnosis appears questionable. The hospital records do not

reflect symptoms that would warrant such a diagnosis and the

treating psychiatrist did not prescribe anti-depressants, which would

typically be given for such a disorder. It is more likely that at:

that time Mr. Horn also experienced an adjustment disorder, which

is not uncommon for individuals with his personality make up."

"The behavior described at the time of his 1991 hospitalization and

his 1992 arrest along with the behavior alleged in the instant

offense, if true, also suggest the possible diagnosis of sexual

sadism. The information available at the present time, however,

only indicates such behavior in the context of the breakup of a

significant relationship. Given that limitation, this diagnosis

would not be warranted based solely on the present information."

(Exhibit 23,BOP 258-59)

Dr. Mrad's diagnostic Impression was as follows:

"According to the Diagnostic and Statistical Manual of Mental
Disorders, Fourth Edition! of the American Psychiatric AssociatioD7
Mr. Horn would be diagnosed as follows:

Axis I: No Diagnosis

Axis II: Narcissistic Personality Disorder with Borderline and Paranoid Traits
Axis III: No Diagnosis" (Exhibit 23, BOP 259)"

24. On April 11, 1997, the Honorable Neal B. Biggers, Jr. determined the guideline

imprisonment range to be151 to 188 months and sentenced Mr. Horn to a total term of 155

months imprisonment.  Mr. Horn was ordered to be supervised release for a term of five years

under the standard conditions of supervision.  However, the drug testing condition was waived.

(Exhibit 26,BOP 7-13)

25.  There were no recommendations for mental health treatment made by the Sentencing

Court at that time and Mr. Horn has not participated in a sex offender treatment program while

incarcerated or confined awaiting this hearing.  A series of Mental Status Examinations in July,

1997 (Exhibit 44, BOP 161 ), July, 2003 (Exhibit 45, BOP 160) and May, 2007 (.Exh. 50, BOP

13

597), found that he was not in psychological distress or cognitive dysfunction and the examinations were within normal limits. In July, 2001, Mr. Horn initiated admission and completed a five session Anger Management course. (Exhibit 46, BOP 180)

26. On June 30, 2000 Mr. Horn was interviewed for completion of a psychological test called the PCL-R, a test designed to detect psychopathy. His score of 11 was very low and reported as not reflective of psychopathy. (Exhibit48, BOP636)

27. On October 30, 2006 a CIVIL COMMITMENT OF A SEXUALLY DANGEROUS PERSON review was completed as required pursuant to 18 U.S.C. §4248. The form was generated first by Mr. Horn's case manager and indicated that Mr. Horn was confined for offense conduct that was sexual in nature and that he had a prior conviction for an offense that was sexual in nature. The form was forwarded to Dr. Daniel E. Trent, Chief of Psychology for FCI Edge, Missouri. Dr. Trent found "no documented evidence of sexual misbehavior" and wrote diagnosis "none". This form was then transmitted to W. Vining, the Special Investigative Supervisor for §4248 assignment. Mr. Vining indicated that Mr. Horn should not be assigned as a "sexual predator". (Exhibit 23, BOP 243).

28. On June 27, 2007, Dr. Lela Demby submitted a Pre-Certification Evaluation Report (Exhibit 29, BOP 590-595) based on Mr. Horn's BOP records as well as the application of two risk assessment tests, the Static-99 and the Rapid Risk Assessment for Sexual Offender Recidivism (RRASOR), to those records. Both require a determination of the index sexual offense. Dr. Demby used the 1997 Atlanta prison indecent exposure offense, which had the effect of increasing Mr. Horn's score on these recidivism prediction tests.. Dr. Demby's DSM-IV-TR Diagnostic Impression was

> Axis I   Paraphilia Not Otherwise Specified (Nonconsent)(Primary)
>
> Sexual Sadism (Provisional)
>
> Axis II   Narcissistic Personality Disorder with Borderline Personality Traits
>
> Axis III No Diagnosis

The report "did not render an opinion about [Mr. Horn's] eligibility as a Sexually Dangerous Person." (BOP 701)

29.  On September13, 2010, Dr. Demby submitted a §4248 Forensic Evaluation Report (Exhibit 30, BOP 803) as an opinion being sought by the US Attorney's Office regarding whether [Mr. Horn] currently meets criteria as set forth in 18 U.S.C. §4248.  The assessment resources were those available and apparently utilized in her 2007 evaluation except that she included her own June 27, 2007 as an additional resource.  Mr. Horn again refused to be interviewed personally. Dr. Demby utilized the Static 99R, the Static 99 updated to take into account the current age of the offender as an actuarial measure of relative risk of reoffending. Her Diagnostic Impression was:

Axis I      Sexual Sadism, 302.84

Axis II     Narcissistic Personality Disorder

             Personality Disorder Not Otherwise Specified with Borderline Traits

(Exhibit 30, BOP 819)

Dr. Demby rates Mr. Horn's score on the Static 99R as 4, applied the high risk and needs group's rate of recidism and determined that the prediction of recidivism was 20.1% over five years and 29.6% over ten years. (Exhibit 30, BOP 821)  Dr. Demby applied as a clinician additional static and dynamic factors to exacerbate Mr. Horn's overall risk and concluded as her opinion "that as a result of [Mr. Horn's] serious mental illness, abnormality, or disorder, Mr. Horn would have serious difficulty in refraining from sexually violent conduct or child molestation if released" and it was her opinion that Mr. Horn should be committed. (Exhibit 30,BOP 824)

30.  Dr. Dale R. Arnold submitted an evaluation of Mr. Horn to the US Attorney on September 24, 2010.  Again, Mr. Horn refused to be interviewed.  Dr. Arnold's sources of information were contained in the BOP files provided by the United States Attorney's office.  In addition,  Dr. Arnold utilized the Static –99R, Stat2002R, the Minnesota Sexual Offender Screening Tool-Revised, the Stable 2007, and the Sexual Violence Risk-20 as well as what he determined to be relevant dynamic risk factors.  Dr. Arnold concluded that Mr. Horn's DSM-IV –TR diagnostic profile  was

Axis I      Sexual Sadism

Axis II     Personality Disorder NOS with antisocial, narcissistic, and borderline traits.

Dr. Arnold concluded that as a result of [Mr. Horn's] serious mental illness, abnormality, or disorder, Mr. Horn would have serious difficulty in refraining from sexually violent conduct or child molestation if released" and it was his opinion that Mr. Horn should be committed.

31. Mr. Horn voluntarily submitted to an interview with Dr. Arnold on April 4, 2011. On April 11, 2011, Dr. Arnold submitted an update to his original report reaffirming and restating his original opinions and finding facts to reinforce those opinions.

32. Dr. Joseph J. Plaud submitted an evaluation and testified as an additional mental health examiner selected by respondent pursuant to 18 U.S.C. §§4247(b) and 4248(b). He had reviewed all available records, the same documents reviewed by Drs. Arnold and Demby, and conducted a personal interview of Mr. Horn on February 8, 2011. Dr. Plaud also utilized two tests currently in use to calculate Mr. Horn's statistical risk to reoffend. These were the Multisample Age Stratified Table of Sexual Recidivism Rates (MATS-1) and the International Personality Disorders Examination (IPDE).

Dr. Plaud testified that, although Mr. Horn's crimes are certainly sexually violent, Mr. Horn does not suffer from a serious mental illness, abnormality of disorder and, even if he presently suffered from such a condition, the risks that he would commit another sexually violent crime are minimal.

In regard to the diagnosis of sexual sadism, Dr. Plaud testified that, as a matter of psychological and behavioral analysis, Mr. Horn's sexual offense history is intra-familial in nature, and squarely focused on non-sexual issues involving the break-up of his marriages/intimate relationships, not a generalized psychological condition that has any probability of putting the public at risk. He did not engage in sexually offensive behavior because of or as a function of underlying sexual deviance, but rather forced sexual intercourse was part of the larger psychological sequella of his then inability to deal with the break-ups of his intimate relationships. While coerced sexual behavior was a part of his reaction, it was not the cause of his criminal behavior. Most of the elements of his sexual crimes were not sexual per se, but rather part of the larger issue surrounding his reaction to the failure of his intimate relationships. Further, given that his victims have been his intimate adult partners, as his sexual offenses took place within the confines of his family/paramour environment, his sexual offense history points

to the conclusion of low present day risk. Dr. Plaud testified that there is absolutely no scientific or statistical evidence that in February, 2011 Mr. Horn represents a more general risk to engage in sexual offenses.

In support of his analysis, Dr. Plaud pointed out that Mr. Horn , even if his goal was to the alleged attainment of sex by rape, Mr. Horn had had other intimate sexual relationships in which no sexual violence or sadism occurred.  In these relationships, there was no evidence of unusual sex playing or acting out and no instances where there was a perceived arousal because of fanaticizes of pain, fear, or humiliation being inflicted on his sexual partner. The same is true of his sexual relationships with all three victims of these sexual offenses.  They had a normal sex life before they the victims decided to abandon the relationship. That fact tends to indicate a breakup and his forcing sexual relations on them when they were abandoning the relationship was part of his attempt bring them back into the relationship, to make them love him again. When he had them restrained, he still had the relationship.

Dr. Plaud pointed out actions and statements within the record that clearly indicate the sexual components of these crimes were attempts by Mr. Horn to elicit affection from his victim and to manipulate a return of the relationship, even as he knew they were initially submitting to sex unwillingly, even out of fear of bodily harm.

In regard to a diagnosis of personality disorder, Dr. Plaud conducted a clinical interview, consistent with the Ethical Principles of Psychologist and Code of Conduct in making diagnostic statements as part of the evaluation. The International Personality Disorders Examination administered by Dr. Plaudis is designed as a uniform approach for assessing personality disorders for the DSM-IV.

Dr. Plaud did not find evidence in his evaluation that Mr. Horn suffers from any diagnosable personality disorder,

Although concluding that the respondent did not suffer from a serious mental illness, abnormality or disorder, Dr. Plaud addressed the effect that the passage of time has on a problem like anger manage.  One matures and realizes that you cannot act like a spoiled child and being angry is no way to gain favor. You have the benefit of hindsight, which improves your foresight.

17

And, significantly, Mr. Horn has been severely punished for his past crimes. These factors, when combined with Horn's prison conduct, efforts to improve his education, his in prison work history, and his family contacts and supervised release under appropriate suitable special conditions make it highly unlikely that Mr. Horn would commit another sexual crime.

## G. Dynamic Factors

33. <u>Maturity</u>- A salient and positive dynamic factor is that Mr. Horn last offense conduct occurred more than fifteen years ago and, aside from maturing emotionally with age, he has had fifteen years incarceration as a direct result of his actions. As he testified, he now has the benefit of hindsight which clearly reveals his immaturity and his anger management problems, but, also, the great fear and suffering his immaturity and anger had caused to the ones he thought he loved. Mr. Horn realizes his actions were counterproductive to achieving his goals. He realizes all these facts .He now has the foresight to know that his goals of working, being with his family, perhaps being a father to his nearly adult child, and being free are all contingent upon his not losing sight of his past failures and his goals for the future.

34. <u>Support from Family and the Community</u>- . In the general area of Missouri where Mr. Horn plans to reside upon release, Mr. Horn has two brothers and one sister still surviving. They are aware of his crimes and they have not abandoned him. Although his mother has passed away, Mr. Horn is close to both his stepfather and his natural father. In addition, Mr. Horn has aunts and uncles and "about two dozen cousins" in the area.

35. <u>An Excellent Prison Record</u>- The record reveals that Mr. Horn had only one infraction in serving his term in prison and only one write up in the four years that he has been detained under §4248 certification. It appears that he has been cooperative with staff and sought and performed gainful employment when available. He has paid his fine and costs as ordered by the Sentencing Court.

36.  Employment Opportunities- Mr. Horn was trained as a mechanic in the military and has learn several trades while incarcerated.  He has picked up some educational courses in the BOP and he has the benefits of the Veteran's Benefits. It is noted that Mr. Horn would not be allowed to be a long distance truck driver while on supervised release.

37.  The Benefit of Supervised Release- In mid 2006 the Bureau of Prison, together with the US Probation Office in Kansas City, Missouri, and with Mr. Horn's cooperation, started working on a "Relocation Supervised Release Plan".  Mr. Horn would be released via Good Conduct Time Release, relocate to the Sedalia, Missouri area and be placed with a Community Corrections Center for 90 days.  The Center would assist with his post release adjustment by providing employment counseling and placement, substance abuse information, daily life skills, and assistance in re-establishing family and community ties. Upon release from community corrections, Mr. Horn would reside with his father.

The plan continued. Under supervised release Mr. Horn would register as a sex offender and participate in a psychosexual evaluation and successfully participate in any sex offender counseling program as directed by the Probation Office.  While undergoing counseling, Mr. Horn would be required to submit to a polygraph to assist in treatment planning and/or monitoring, and pay any associated costs as directed.

Further, Mr. Horn would not have any contact with the victim(s).  This included any physical, visual, written, or telephone contact with the victim.  Additionally, [Mr. Horn] would not directly or indirectly cause or encourage anyone else to have such contact. Additionally, standard terms of supervised release would apply. (BOP 197-2010)

## G.  Findings of Ultimate Fact

38.  Mr. Horn has engaged in sexually violent conduct  that has caused him to be sexually dangerous to others.

39.   Mr. Horn does not presently suffer from a serious mental illness, abnormality or disorder.

19

40.  Mr. Horn would not have serious difficulty as a result of a serious mental illness, abnormality or disorder, serious difficulty in refraining from sexually violent conduct or child molestation if released?

Based upon the foregoing findings of fact, this Court CONCLUDES AS A MATTER OF LAW that the Government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act and the Constitution.

:

Respectfully submitted, this 17th day of October, 2011.

*I⎟s⎟l Jerry W. Leonard*

JERRY W. LEONARD

Attorney for Defendant

PO Box 3

Raleigh, North Carolina 276021

Telephone: 919-831-4767

Fax: 919-831-4202

E-mail: jjwleonard@cs.com

N.C. State Bar No. 2705


The Undersigned certifies that copies of said Motion have been served upon:

R.A. Renfer and Norman Acker

Assistant United States Attorneys

Suite 800, Federal Building

31 0 New Bern Avenue

Raleigh, NC 27601-1461

by electronically filing the foregoing with the Clerk of Court, using the *CM⎟ECF* system which will send notification of such filing to the above.

This 9th day of August, 2011.

20

/s/Jerry W. Leonard

Attorney for Respondent

PO Box 3
Raleigh, North Carolina 276021
Telephone: 919-831-4767
Fax: 919-831-4202
E-mail: jjwleonard@cs.com
N.C. State Bar No. 2705