IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-HC-2177-BR

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Petitioner, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| JAMES BARTON HORN, | ) | |
| | ) | |
| Respondent. | ) | |

On 27 September 2007, petitioner United States of America ("the government") initiated this proceeding seeking to have respondent James Barton Horn ("Horn") civilly committed as a sexually dangerous person under the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), codified at 18 U.S.C. §§ 4247-4248. Pursuant to 18 U.S.C. § 4247(d), the court conducted an evidentiary hearing in this matter on 24 and 25 October 2011.

## I. BACKGROUND

Horn was born in 1967 and was 44 years of age at the time of the evidentiary hearing. He has no juvenile or adult criminal history other than three sexually violent incidents, which will now be described in detail. Horn's first known incident of sexual violence occurred in January 1991, three weeks after he separated from his first wife, "N." (Gov't Exs. 2-5; 32 at 4-6.)[1] He had been married to N. for approximately 13 months. (Id.) Upon learning that she had filed for divorce, Horn entered her apartment on 29 January 1991, physically restrained her, tied her down, made verbal threats, and tortured her over a 24-hour period. (Id.) In order to end her

---

[1] In relaying the background information in this case, the court cites mainly to the facts presented by the government, as the government bears the burden of proof in this proceeding. The court further notes that Horn does not dispute any particular facts recounted within this section. (See generally Report of Dr. Plaud, Resp. Ex. 76, at 4-7; Resp.'s Proposed Findings of Fact & Conclusions of Law, DE # 112, at 3-8.)

ordeal, N. told Horn that she would return to the relationship if he would seek professional help. (Id.) Horn agreed to do so, and he then took N. to a restaurant, where she was able to flee. (Id.) Horn subsequently drove himself to Orchard Creek Hospital in Texas, where he was voluntarily admitted on 30 January 1991. (Id.) The records from Orchard Creek Hospital indicate that Horn told hospital personnel that "he bound his wife with electrical tape and put a sheet over her and raped her repeatedly." (Gov't Ex. 2 at 2.) On 28 February 1991, Horn was discharged from Orchard Creek Hospital with diagnoses of Major Depressive Disorder, Explosive Personality Disorder, and Narcissistic Personality Disorder. (Gov't Ex. 5 at 1.) N. did not file a police report, and Horn was not prosecuted for his conduct. (Gov't Ex. 32 at 6.)

The second documented incident of sexually violent conduct by Horn took place approximately one year later against his 22-year-old girlfriend, "K." (Gov't Exs. 6; 32 at 6.) The couple had dated for approximately five weeks when K. broke up with Horn over the telephone on 17 February 1992 while Horn was out on a job as a truck driver. (Id.) On 18 February 1992, Horn returned to the couple's shared apartment, entered while K. was asleep, put duct tape on her mouth and hands, and forced her to have sex. (Id.) He then tied her hands with shoe laces, forced her into his truck and drove across state lines to a truck stop, where he tied her up and raped her again. (Id.) Horn later drove K. home and released her. (Id.) In September 1993, he pled guilty to charges of sexual battery and kidnapping. (Gov't Exs. 25 at 17; 32 at 6.) He received a 4-year sentence of imprisonment but was released in March 1995. (Id.)

The third documented incident of sexually violent conduct by Horn took place from 20 July through 22 July 1996 and involved the kidnapping and rape of his second wife, "D." (Gov't Exs. 25 at 3-6; 32 at 7-9.) D. had moved out of the marital home in May 1996 and had filed for

2

divorce. (Gov't Exs. 25 at 4; 32 at 7.) She was pregnant at the time. (Gov't Exs. 25 at 3-4; 32 at 7.) On the evening of 20 July 1996, Horn broke into the home where D. lived with her 9-year-old daughter from a previous marriage. (Gov't Exs. 25 at 4; 32 at 7.) He informed D. that he had been stalking her for a couple of weeks. (Id.) He told her to lay down on the bed and held a pair of scissors to her throat. (Id.) Horn told D.'s daughter, who was screaming and crying, to go into the bathroom. (Id.) Horn asked D. if she wanted to have sex, and she acquiesced out of fear of being harmed. (Id.) At some point, Horn hit D. in the head. He told her that he would kill her if she did not do exactly what he said. (Gov't Exs. 25 at 4; 32 at 8.)

Horn then drove D. to a motel in West Memphis, Arkansas. (Gov't Exs. 25 at 5; 32 at 8-9.) He tied one of D.'s wrists to a bed rail and the other to himself before he went to sleep. (Gov't Exs. 25 at 5; 32 at 9.) They later left the motel and drove to Springfield, Missouri. (Id.) At some point, Horn made D. get into the trunk of the vehicle. (Id.) They went to another motel, where Horn tied D. up with shoe laces. (Id.) Over the course of the abduction, Horn forced D. to have sex with him several times. (Id.; Resp.'s Proposed Findings of Fact & Conclusions of Law, DE # 112, at 7.)

The Federal Bureau of Investigation eventually raided the motel in Springfield and arrested Horn. (Gov't Ex. 30 at 10; Resp.'s Proposed Findings of Fact & Conclusions of Law, DE # 112, at 7.) In January 1997, Horn pled guilty to interstate kidnapping and was sentenced to a term of 155 months imprisonment followed by five years of supervised release. (Gov't Exs. 26; 30 at 2, 14; 32 at 7.)

3

Case 5:07-hc-02177-BR-JG   Document 121   Filed 12/08/11   Page 3 of 13

## II. DISCUSSION

The Adam Walsh Act provides for the civil commitment of "sexually dangerous person[s]." 18 U.S.C. § 4248. Under 18 U.S.C. § 4247(a)(5), a "sexually dangerous person" is one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." A person is "sexually dangerous to others" if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

Under the Adam Walsh Act, the government has the burden of proving that Horn is sexually dangerous by clear and convincing evidence. 18 U.S.C. § 4248(d). The clear and convincing evidence standard is an "'intermediate standard,'" lying somewhere "'between preponderance of the evidence and proof beyond a reasonable doubt.'" United States v. Hunt, 643 F. Supp. 2d 161, 179 (D. Mass. 2009) (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)). The government must produce "'[e]vidence indicating that the thing to be proved is highly probable or reasonably certain.'" Id. (alteration in original) (quoting Black's Law Dictionary 596 (8th ed. 2004)).

Thus, in order to prove that Horn is a "sexually dangerous person," the government must prove three elements by clear and convincing evidence: (1) that Horn engaged in or attempted to engage in sexually violent conduct or child molestation; (2) that Horn suffers from a serious mental illness, abnormality, or disorder; and (3) that, as a result of the serious mental illness, abnormality, or disorder, Horn would have serious difficulty in refraining from sexually violent conduct or child molestation if he were to be released. See 18 U.S.C. § 4247(a)(5)-(6); 18

U.S.C. § 4248.

Three experts testified at the evidentiary hearing. Dale Arnold, Ph.D., and Lela Demby, Ph.D., testified on behalf of the government. Joseph J. Plaud, Ph.D., testified on behalf of Horn as an additional examiner selected pursuant to 18 U.S.C. § 4247(b). Horn also testified on his own behalf.

A. <u>Past Violent Sexual Conduct</u>

The court finds that the first criterion for commitment under the Adam Walsh Act, that Horn has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past, is satisfied. 18 U.S.C. § 4247(a)(5). All three experts in this case agree that Horn committed several acts of sexually violent conduct (<u>see</u> Gov't Exs. 30 at 2; 32 at 4; Resp. Ex. 76 at 1, 8), and Horn does not dispute that the government has proven the first element (Resp.'s Proposed Findings of Fact and Conclusions of Law, DE # 112, at 19 ¶ 38).

B. <u>Serious Mental Illness, Abnormality, or Disorder</u>

To meet its burden of establishing that Horn is "sexually dangerous to others," the government must also prove that Horn "suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6). In this case, both Dr. Arnold and Dr. Demby agree that Horn suffers from Sexual Sadism, which is a form of paraphilia, as defined by the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, Fourth Edition, Text Revision ("DSM-IV-TR"). (Gov't Exs. 30 at 17-18; 32 at 20-22.) These two doctors also agree that Horn suffers from some form of personality disorder, but they disagree slightly about the exact type of personality disorder that Horn has. Dr. Demby classifies Horn's personality disorder in two ways: (a) Narcissistic Personality Disorder, and (b) Personality Disorder Not Otherwise Specified, with Borderline

5

Traits. (Gov't Ex. 30 at 17, 19.) Dr. Arnold agrees that Horn has a Personality Disorder Not Otherwise Specified, and agrees that Horn's personality has narcissistic and borderline traits, as well as antisocial traits, but he does not think that these traits rise to the level of meeting the criteria of Narcissistic Personality Disorder, as opined by Dr. Demby. (Gov't Ex. 32 at 22.)

The court first considers whether the government has proven that Horn suffers from Sexual Sadism. The DSM-IV-TR lists the criteria of this disorder as follows:

> A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving acts (real, not simulated) in which the psychological or physical suffering (including humiliation) of the victim is sexually exciting to the person.
>
> B. The person has acted on these sexual urges with a nonconsenting person, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

DSM-IV-TR § 302.84 at 574. Examples of Sexual Sadism in the DSM-IV-TR include: "restraint, blindfolding, paddling, spanking, whipping, pinching, beating, burning, electrical shocks, rape, cutting, stabbing, strangulation, torture, mutilation, or killing." Id. at 573.

The court finds that the government has failed to prove by clear and convincing evidence that Horn suffers from Sexual Sadism. In reaching this conclusion, the court credits the testimony of Dr. Plaud, who testified that the key factor in properly diagnosing Sexual Sadism is that "'it is the suffering of the victim that is sexually arousing.'" (Resp. Ex. 76 at 9 (emphasis omitted) (quoting DSM-IV-TR § 302.84 at 573).) In other words, the victim must first suffer for the sexual sadist to become aroused and then commit a rape, for example. While Dr. Plaud agrees that Horn used violence when sexually assaulting his three victims, Dr. Plaud also testified that there is no demonstrable evidence which shows that Horn derived arousal and pleasure specifically from the act of inflicting pain. Dr. Plaud testified that for sexual sadists, a

6

large part of their sexual experience would involve suffering, and such was not the case with Horn. The court agrees with Dr. Plaud that

> [t]here is no evidence that any forcible sexual activity ever took place in [Horn's] intimate relationships but for the criminal behavior that took place in context of the break-ups of his relationships. Even the official versions of the offenses at no time support that the suffering of his victims was the prerequisite function for him to achieve sexual arousal.

(Id.)

The court also credits Horn's own testimony that he did not derive sexual gratification from the infliction of pain. Additionally, Horn testified that other than the sexual offenses relating to the break-up of three of his intimate relationships, his sexual relationships with his three victims, as well as with other women,[2] did not involve violence or pain. This testimony was corroborated by the deposition testimony of a former girlfriend of Horn, who stated that their relationship did not involve any form of violence and that the relationship ended amicably. (Resp. Ex. 79 at 9-10.) Accordingly, the court finds that the government has not proven by clear and convincing evidence that Horn suffers from Sexual Sadism.

The government has also failed to show that Horn currently has a personality disorder[3] rising to the level of a serious mental illness, abnormality, or disorder. The diagnoses of Dr. Arnold and Dr. Demby regarding this issue are based to a large extent on Horn's behavior at the time that he committed the sexual offenses at issue. However, while Horn has been in federal

---

[2] Horn has estimated that he has had eight to ten female sexual partners over the course of his life. (Gov't Ex. 32A at 4.)

[3] The DSM-IV-TR describes a personality disorder as "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress and impairment." DSM-IV-TR at 685.

7

custody for the past fifteen years, his disciplinary history has been minimal and involves no sexual misconduct.[4] (Resp. Ex. 76 at 10.) An individual experiencing great difficulty conforming his conduct to the rules of society would likely exhibit the same pattern of bad behavior while incarcerated, but Horn has not done so. In contrast to many inmates, his conduct while incarcerated indicates that he does not have difficulty obeying general rules, even the strict regulations of the prison environment. He has also interacted appropriately with staff and other inmates.

In addition, Horn has been consistently employed while in federal custody, and he has completed various educational courses, including an anger management course. (See, e.g., Gov't Exs. 30 at 14; 32 at 11; Resp. Exs. 46-47.) These actions all show some improvement in Horn's willingness to change. Thus, absent more current evidence of deviant behavior,[5] it is not clear that Horn currently suffers from a personality disorder. Moreover, even if Horn does currently have some type of personality disorder, the government has not shown that such a disorder is sufficiently severe to constitute a "serious" mental disorder within the meaning of the Adam Walsh Act. See United States v. Wilkinson, 646 F. Supp. 2d 194, 204 (D. Mass. 2009) (government failed to prove that respondent's antisocial personality disorder was "serious" where respondent displayed positive behavior while in federal prison, including an excellent

---

[4] Horn was disciplined on 24 August 1997, when he was observed urinating on the prison handball court. He was formally sanctioned for Indecent Exposure and Being Unsanitary or Untidy. He was given ten hours extra duty for the indecent exposure and loss of commissary privileges for being unsanitary. Dr. Arnold did not consider this infraction to be a sexual crime for the purposes of scoring the Static-99R. (Gov't Ex. 32 at 16.) Horn's only other disciplinary incident occurred in December 2010 when he refused an order to transfer to another cell with a new cell mate. (Resp. Ex. 76 at 7; Resp.'s Proposed Findings of Fact & Conclusions of Law, DE # 112, at 8 ¶ 19.)

[5] The court also notes that the DSM-IV-TR indicates that "[s]ome types of Personality Disorder (notably, Antisocial and Borderline Personality Disorders) tend to become less evident or remit with age . . . ." DSM-IV-TR at 688.

disciplinary record, the completion of several education courses, and a consistent employment history). As a result, the court concludes that the government has failed to prove by clear and convincing evidence that Horn suffers from a personality disorder that is sufficient for commitment under the Adam Walsh Act.

C.     Serious Difficulty Refraining

Assuming for the sake of argument that the government could prove that Horn suffers from a "serious mental illness, abnormality, or disorder," the court finds that the government has not proven, by clear and convincing evidence, that Horn "would have serious difficulty in refraining from sexually violent conduct . . . if released." 18 U.S.C. § 4247(a)(6). The determination under this prong requires the court to consider Horn's volitional control over his actions, and it is also informed by the constitutional constraints on the civil commitment scheme. In Kansas v. Crane, 534 U.S. 407 (2002), the United States Supreme Court held that in order to civilly commit someone for sexual dangerousness "there must be proof of serious difficulty in controlling behavior." Id. at 413. The Supreme Court noted that this standard allowed courts wide discretion in relying on a number of different factors relevant to sexual dangerousness. The standard did not have "a particularly narrow or technical meaning;" nor was it demonstrable with "mathematical precision." Id.

As a result, the court does not construe this criterion for commitment to require proof of any statistical probability of reoffense. The Adam Walsh Act does not ask the finder of fact to determine exactly how likely the respondent is to reoffend, but whether he will have "serious difficulty" in refraining from doing so. Recidivism rates are circumstantially relevant to the serious difficulty inquiry because offenders who continually expose themselves to punishment

9

may be presumed to have the most difficulty refraining from sexual reoffending. But the ultimate question called for by the Adam Walsh Act concerns the self-control of an individual, not the statistical re-arrest patterns of a given population. Thus, the court considers the recidivism rates associated with Horn's actuarial scores,[6] but affords them less weight than Horn's past and current conduct, and the testimony of the experts as a whole.

Most significantly, the court finds that Horn will not have serious difficulty in controlling his behavior because his sexual offense history has been confined to very specific circumstances relating to the unwanted end of an intimate relationship. It is uncertain that such a situation may ever arise again in the future. The court credits the reasoning of Dr. Plaud with regard to this issue:

> As a matter of psychological and behavioral analysis, Mr. Horn's sexual offense history is intrafamilial in nature, and squarely focused on <u>non-sexual</u> issues involving the break-up of his marriages/intimate relationships, not a generalized psychological condition that has any probability of putting the public at risk. He did not engage in sexually offensive behavior because of or as a function of underlying sexual deviance, but rather forced sexual intercourse was part of the larger psychological sequella of his then inability to deal with the break-ups of his intimate relationships. While coerced sexual behavior was a part of his reaction, it was not the cause of his criminal behavior. . . . Further, given that his victims have been his intimate adult partners, as his sexual offenses took place within the

---

[6] Dr. Arnold testified that he used several actuarial instruments to assist him in determining whether Horn meets the criteria for commitment. Dr. Arnold gave Horn a score of 5 on the Static 99-R actuarial instrument, which indicates a moderate to high risk of reoffense. Dr. Arnold used a "non-routine" sample to determine that Horn falls into a category in which offenders with a score of 5 have been found to sexually reoffend at a rate of 20% within five years and 28% within ten years. Dr. Arnold also used the Static-2002R, scoring Horn at a 4, which indicates a low to moderate risk and a rate of reoffense of 13% within five years and 21% within ten years. In addition, he used the Minnesota Sex Offender Screening Tool-Revised, giving Horn a score of 1, which places him in a low risk category that indicates a 15% probability of rearrest for a sexual offense within six years. (Gov't Ex. 32 at 23-24.)
Dr. Demby testified that Horn's score on the Static 99-R actuarial instrument was initially a 5 but that it has now dropped to a 4 due to his increase in age. She testified that offenders from a preselected high risk and needs sample with the same score as Horn have been found to sexually reoffend at a rate of 20.1% in five years and 29.6% in ten years. (Gov't Ex. 30 at 19.)
Dr. Plaud took issue with the use of the Static 99-R and instead used an actuarial instrument called the Multisample Age-Stratified Table of Sexual Recidivism Rates to determine Horn's reoffense rate to be 25.5% within eight years. (Resp. Ex. 76 at 12.)

confines of his family/paramour environment, his sexual offense history points to
the conclusion of low present day risk.

(Resp. Ex. 76 at 3 (emphasis in original).)

Horn also presented evidence to show that as sexual offenders age, the rate of recidivism declines. (See, e.g., Resp. Ex. 76 at 2-3.) Horn was 29 years old when he entered federal custody for his most recent offense, and he is now 44 years old. Horn himself testified that he has matured significantly in the fifteen years that he has been in custody, and that until he witnessed others committing violent acts in prison, he did not realize the enormity of what he had done. Thus, Horn's age should reduce his risk of reoffense.

Furthermore, after being released from federal custody on his interstate kidnapping conviction, Horn has been ordered to complete a five-year supervised release term. (Gov't Ex. 26 at 3-4.) The conditions of his supervised release include sex offender treatment. (Resp. Exs. 54-55; Resp.'s Proposed Findings of Fact and Conclusions of Law, DE # 112, at 19.) While undergoing sex offender counseling, Horn would be required to submit to a polygraph test to assist in treatment planning and/or monitoring. (Id.) Horn would also be prohibited from having any contact with his second wife. (Id.) These conditions are properly considered in assessing any future risk that Horn may pose. See United States v. Sharkany, 133 F.3d 919 (table), 1998 WL 17031, at *2 (4th Cir. Jan. 20, 1998); Wilkinson, 646 F. Supp. 2d at 208. The conditions of Horn's release and the length of the supervised release period diminish the risk that he will commit crimes generally, and sexual crimes in particular, if he is not civilly committed.[7]

---

[7] In considering these factors, the court realizes that district courts have reached differing conclusions on the issue of whether a term of supervised release is tolled under 18 U.S.C. § 3624(e) while an individual is detained pursuant to a certification filed by the government under the Adam Walsh Act. Compare Tobey v. United States, — F. Supp. 2d —, Civ. A. No. DKC 10-1358, Crim. No. DKC 03-0151, 2011 WL 2623495, at *3-7 (D. Md. June 29,
(continued...)

The court realizes that it is possible that Horn may commit an act of sexual violence in the future. "However, in the absence of clear and convincing proof that a serious mental impairment causes an individual to have serious difficulty in controlling his behavior, the constitution requires reliance on the criminal law, rather than a civil commitment, to deal with that risk." Wilkinson, 646 F. Supp. 2d at 209. As the government has not presented such clear and convincing proof, Horn may not be civilly committed.

### III. CONCLUSION

For the foregoing reasons, the government has failed to show by clear and convincing evidence that Horn suffers from a serious mental illness, abnormality, or disorder, as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released. Accordingly, the court concludes that Horn is not a sexually dangerous person under the Adam Walsh Act and ORDERS that the government release Horn forthwith to

---

⁷(...continued)
2011) (the issuance of a certificate under § 4248 tolls the running of a term of supervised release); United States v. Combe, No. 1:04-CR-51 TS, 2011 WL 976892, at *1-2 (D. Utah, Mar. 18, 2011) (same), appeal dismissed, No. 11-4063, 2011 WL 3677793 (10th Cir. Aug. 23, 2011); United States v. Bolander, No. 01-CR-2864-L, 2010 WL 5342202, at *1-3 (S.D. Cal. Dec. 21, 2010) (same) with United States v. Seger, — F. Supp. 2d —, No. 1:98-CR-00065-JAW, 2011 WL 3555670, at *2 & n.4 (D. Me. Aug. 8, 2011) (noting that at least three "civil detainees pursuant to 18 U.S.C. § 4248 have obtained orders from their sentencing judges recognizing that their terms of supervised release run during their civil detention" (citation and internal quotation marks omitted)); United States v. Brown, No. 3:04-cr-00119, 2011 WL 1831627, at *3-5 (D. Alaska May 12, 2011) (issuance of a certificate under § 4248 does not toll the running of a term of supervised release). Given the apparent lack of controlling authority on this issue, the court feels compelled to note that while it has considered Horn's term of supervised release in determining that he is not a sexually dangerous person under the Adam Walsh Act, the court would have reached the same conclusion even if the conditions of Horn's release and the length of the supervised release period had not been considered.

Case 5:07-hc-02177-BR-JG   Document 121   Filed 12/08/11   Page 12 of 13

the custody and supervision of the appropriate U.S. Probation Officer. The Clerk is DIRECTED to close this case.

This 8 December 2011.

                                                              W. Earl Britt
                                                              Senior U.S. District Judge